EUGENE ILLOVSKY (CA SBN 117892)
Eugene@illovskylaw.com
ILLOVSKY LAW OFFICE
MATTHEW DIRKES (CA SBN 255215)
Matthewdirkes@gmail.com
1611 Telegraph Avenue, Suite 806
Oakland, California 94612
Telephone: 510.394.5885

Attorneys for Defendant
MARK FEATHERS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>MARK FEATHERS,<br><br>            Defendant. | Case No.   CR 14-0531 LHK<br><br>**DEFENDANT'S TRIAL MEMORANDUM** |

Defendant Mark Feathers hereby submits the following trial memorandum.

**I.    INTRODUCTION**

Can a person be held criminally liable for defrauding investors if the conduct that constituted the supposed fraud was expressly disclosed to the investors in the offering documents? The Court will need to answer that question in this case.

Indeed, the Court has its work cut out for it at this long securities fraud trial. Mr. Feathers is charged with 17 counts of securities fraud and 12 counts of mail fraud arising from his operation of two funds – Investors Prime Fund and the SBC Portfolio Fund – that invested in real estate loans guaranteed by the Small Business Administration. Each fund entered into Operating Agreements with Mr. Feathers's management company, Small Business Capital Corporation ("SBCC"). Under the terms of the Operating Agreements, which were disclosed to investors,

money in the form of fees, advances, and loans flowed between the funds and SBCC. The government seeks to prove those money flows were not disclosed and thus criminally fraudulent.

The evidence will show that the conduct the government contends was fraudulent was either: (1) approved by fund investors; or (2) disclosed in offering documents and in the investment funds' financial statements. How did this come about? We think, as the indictment reflects, the government fundamentally misunderstands the disclosures Mr. Feathers made to investors in his funds. In at least a couple of critical places, as we show below, the indictment simply has it wrong. The government will not be able to prove that Mr. Feathers intended to defraud any investors.

## II.   FACTUAL SUMMARY

This case revolves around activity at two investment funds founded by defendant Mark Feathers, the Investors Prime Fund (founded in 2005) ("IPF") and the SBC Portfolio Fund (founded in 2007) ("SPF," with IPF, the "Funds"). Accredited investors purchased Units in the funds to share in the Funds' profits, pursuant to offering documents (that had been reviewed at the California Department of Corporations) and pursuant to a Subscription Agreement that provided additional warnings.

The main focus of the government's case is certain payments or advances made between the Funds and the management company, SBCC, that provided services to the Funds. Two questions for the jury and the Court will be (1) whether those payments were disclosed to investors or kept secret from them; and (2) whether the payments were authorized by Fund documents (or, more specifically, whether Mr. Feathers believed they were).

IPF and SPF invested in real estate loans made to small businesses under two programs (504 and 7(a)) run by the Small Business Administration ("SBA"). Indeed, Mr. Feathers became one of 14 lenders licensed nationally by the SBA under its 7(a) program. SBA real estate mortgages can be attractive investments, largely because about 80% of the principal is government-guaranteed. The loans must be underwritten in accord with SBA guidelines, to which Mr. Feathers adhered (and which is why the SBA does audits). The Court will hear at the trial that such loans are frequently sold at a premium into secondary markets (as Mr. Feathers did

in this case); it is not surprising that the loans could attract a premium since they represent years of guaranteed cash flow.

The Funds entered into Operating Agreements with SBCC, pursuant to which SBCC provided management services to each of the Funds (investment funds typically do not have their own employees). These Operating Agreements were disclosed along with the Funds' offering documents and, among other things, explain what moneys SBCC was entitled to receive from the Funds. The offering documents were replete with disclosures about the potential conflicts of interest that could arise from the dealings among the Funds, SBCC, and SBCC's affiliates.

IPF and SPF were professionally and meticulously papered and operated. The evidence will show the Funds' offering documents were prepared by experienced law firms and reviewed by the California Department of Corporations, which allowed them to go effective. The Funds' financial statements were audited by an independent CPA firm. The evidence will also show that Mr. Feathers communicated with the auditors about proper accounting for some of the very items in the indictment (and there is no charge that Mr. Feathers ever lied to the auditors). The Funds were also subject to audits by the SBA and had their financials reviewed by federal banking regulators as well as by regulators in California.

The offering documents explained to fund investors what the Manager (SBCC) would do and how it would make money. For instance, the evidence at trial will show the IPF offering document effective June 11, 2009 states in various places:

> The Fund will engage in the business of purchasing loans secured by first deeds of trust that encumber commercial real estate located primarily in California.
>
> The Manager and its affiliates will receive origination fees payable by the borrowers on Fund loans arranged by the Manager and its affiliates. Origination fees are anticipated to be between zero and 5% of the principal amount of each loan. The Manager and its affiliates may also be entitled to receive loan processing and documentation fees associated with loans arranged by Manager and its affiliates.
>
> It is anticipated that all Fund loans will be "serviced" by the Manager, which will also act as a loan broker in the initial

> placement of Fund loans. The manager will be compensated for such loan servicing activities. The Manager will earn points, not to exceed 5% of loan principal, on loans which it arranges for the Fund.
>
> The Manager shall receive subordinated monthly distributions from the Fund in amounts equal to the remainder of funds available for distribution after all Fund expenses and all allocations of Member Preferred Return have been made to the Members. The distributions to the Manager are in recognition of the services it performs as the servicer of Fund loans and as Manager of the Fund, generally.

As noted, the Funds' investors would get profits from the loans according to the number of Units they owned; this return to investors was described, for investors in IPF, as the "Member Preferred Return," which was the greater of 7.5% or the prime rate. Investors were given the option to take their profits in cash distributions or to have their profits reinvested into the fund.

For investors in SPF, the "Member Return" was the greater of 7.5% or prime + 1.5%. The evidence will show (this is explained below), as a profit, the member return was not a guaranteed amount. The percentage of 7.5% was a target. Simplified, if IPF made, say, 5%, that's what investors would get. But if IPF made, say, 12%, the investors would get 7.5% (and the rest of the profit would go to Mr. Feathers's management company). How these distributions actually occurred is disclosed in detail in the Funds' offering documents and operating agreements, as the evidence at trial will show.

### III. THE GOVERNMENT'S THEORIES

We address for the Court the government's primary theories of liability and issues in the case pertinent to those theories. A touchstone for understanding these issues, and the government's proof problems, is the disclosures made to investors. Mr. Feathers understood that these disclosures were made and that understanding constitutes a critical part of his state of mind when he engaged in the conduct raised in the indictment.

As we will show at trial, the conduct the government seems to say was fraudulent was actually disclosed to investors in documents filed with, and approved by, the California Department of Corporations. Further, the offering documents warned investors up front, in large

type, that:

> NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS OFFERING CIRCULAR, AND ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON. ANY PROSPECTIVE PURCHASER OF UNITS WHO RECEIVES ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD CONTACT THE MANAGER IMMEDIATELY TO CHECK ITS ACCURACY.

Among other things, such a provision warns investors they will not be able to claim that they relied on a comment during an impromptu interaction with a sales representative (which they could have misunderstood).

Investors understood this plain warning. In signing the SPF subscription agreement, they certified that: "I have received, read, and fully understood the [Private Placement] Memorandum and in making this investment I am relying only on the information provided in the Memorandum. I have not relied on any statements or representations inconsistent with those contained in the Memorandum." IPF investors signed a subscription agreement making a similar representation: "I have received, read, and fully understood the Offering Circular and in making this investment I am relying only on the information provided in the Offering Circular. I have not relied on any statements or representations inconsistent with those contained in the Offering Circular."

In light of those warnings, it bears emphasizing that the government does not allege a scheme whereby Mr. Feathers and his investor sales reps tricked investors into ignoring the disclosures in the offering documents and relying instead upon (fraudulent) oral representations and promises.[1] We anticipate some investor testimony that they heard Mr. Feathers say things answering impromptu questions in one-on-one conversations after live sales presentations (that Mr. Feathers did not give) that were inconsistent with the written disclosures. This is precisely the problem the above disclosure anticipates.

---
[1] Nothing in the indictment suggests such a theory.

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

5

It is not yet clear to the defense what the government makes of the disclosures mentioned above or discussed below (or how it plans to get around them to show fraudulent intent).[2]

### A. Did Mr. Feathers Promise a "Guaranteed" Return to Fund Investors?

We expect the government may argue at trial that investors were lured into buying Units in the Funds by an irresponsible, "guaranteed" return. The Indictment alleges the Funds' investors were told they "were to receive" a certain return (Indictment ¶¶ 14, 16), or that the Funds "would pay" a certain return (Indictment ¶ 23). That alleged guarantee is critical to another government claim, discussed below, namely that the pressure to provide a promised return to investors caused Mr. Feathers to engage in a Ponzi-like scheme.

Only one problem here. The evidence at trial will prove there was no such promise or guarantee made to investors. The Indictment is simply wrong. The Funds offered the investors a "Member Preferred Return" of 7.5%; but it was not a guaranteed return. The disclosures in the offering memoranda by which Fund units were sold repeatedly cautioned investors that they could lose money. And the Fund's sales materials – approved by the California Department of Corporations – provided a similar warning.

For example, the offering circular used for IPF throughout the period alleged in the indictment told investors that "[a]ny investment in the Units involves a significant degree of risk and is suitable only for investors who . . . can bear the loss of their entire investment." Moreover, it quite specifically warned investors that "[t]he Member Preferred Return is not guaranteed by the Fund or the Manager or anyone else."

Farther down in the same disclosure: "[i]f Fund profits allocated to Members for any calendar year are less than the Member Preferred Return, the deficiency will not accumulate or be paid from any profits earned in subsequent years." The warnings are succinctly repeated: "[t]he

---

[2] It appears this case against Mr. Feathers is largely (if not entirely) based on a flawed judgment the SEC obtained against him in a complex civil enforcement action. Because Mr. Feathers was compelled to represent himself in that difficult case against an experienced SEC trial team, that court did not have the benefit of truly adversarial proceedings. As a result, many of the critical disclosures we discuss below did not get the full airing they might have otherwise received. If they had, the court there would not have entered the judgment against Mr. Feathers that it did.

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

6

Member Preferred Return is not guaranteed by the Fund, the Manager or any other party, and is also non-cumulative from year to year."

The sales collateral conveyed a similar message. For example, one advertisement that IPF's attorneys submitted for review to the Department of Corporations by letter dated May 26, 2010, touted an annualized percentage yield of 7.00% but warned: "Actual returns may vary. No APY or preferred return is guaranteed and past performance is no indication of future results." The proposed ad also advises that "an investment in the Fund is subject to certain risks" and investors should "review the Offering Circular before investing" to learn of those risks.

B. <u>Loan to Manager (The Note Receivable)</u>

The evidence, including expert testimony at trial, will show that the accountants hired for the Funds changed their minds about an accounting entry. The government contends that the change in that entry demonstrates fraud by Mr. Feathers and that Mr. Feathers should have known accounting better than his accountants. Here's what the jury will hear.

IPF made various payments to SBCC, the management company, related to the organization and syndication costs associated with the fund. Initially, these payments (even though they were costs) were shown on IPF's financial statements – created by the Funds' accountants, Spiegel Accountancy – as a capitalized asset. The evidence at trial will show that the auditors issued an unqualified (that is, "clean") audit opinion for IPF with its audit of the fund's 2009 financials on March 31, 2010,[3] showing these payments to be accounted for as capitalized costs. Mr. Feathers did not oppose what the accountants required.

Sometime between March 31, 2010 and roughly June 23, 2010, Spiegel Accountancy flip-flopped and decided that the organization and syndication payments to SBCC could not be capitalized. Thus, the 2009 audit for the SPF fund shows no capitalized syndication costs, but instead it reflects a "Note Receivable" due from the manager, SBCC. The accountant, Jeffrey Spiegel, claims he wanted the amount of the Note Receivable to reduce the Members' Equity rather than be recorded as a Note Receivable but that Mr. Feathers wanted the Note Receivable

---

[3] The accountant's letter bears the mistaken date March 10, "2009."

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

7

treatment. Mr. Spiegel apparently got comfortable with that. In Note 6 to SPF's 2009 audited financials, investors are advised, that "[t]he receivable from the fund manager is in violation of the Fund's operating agreement and offering circular." As a result of the auditor's conclusion in this Note 6, Mr. Feathers actually sent a letter to investors to get them to ratify the use of the Note Receivable. As Note 6 of the audited financials go on, "the Fund Manager is in the process of obtaining approval of this receivable from the Fund members."

Even though there was a Note Receivable on SPF's books, the accountants issued an unqualified (i.e., "clean") audit opinion for SPF on June 23, 2010, knowing that Mr. Feathers was in the process of obtaining (but did not yet have) approval from the fund's investors for the Note Receivable. The evidence will indeed show that Mr. Feathers sent investors a letter asking them to approve the use of the Note Receivable accounting treatment (in August of 2010). The evidence will also show that Mr. Feathers kept a tally of the investors' votes and that the investors approved the change (from capitalized costs to the Note Receivable).

So what does the government contend here? The indictment alleges that it was fraudulent for Mr. Feathers to cause IPF to issue this Note Receivable (advancing money to SBCC) because the Fund's disclosures show the Funds were "generally prohibited" from making loans to the management company, SBCC. (Indictment ¶ 24). In other words, Mr. Feathers caused IPF secretly to do something that investors were told it would not do.

The trial evidence will show this is plainly incorrect; the government misconstrues the Funds' disclosure documents. It has pointed to the following statement in the disclosures as proof investors were told the loan reflected by the Note Receivable was prohibited:

> <u>No Loans to Manager</u>. No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned or loans purchased as a result of foreclosure (See "Conflicts of Interest – Sale of Real Estate Owned to Affiliates.")

But the government's reading is incomplete. It omits the context, which makes clear that this provision in the offering documents pertains only to *mortgage* loans and not to the sort of advance or operating loan reflected by the Note Receivable. This is obvious on the document's

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

8

face and it is certainly what Mr. Feathers understood the disclosure to mean.

We know that the disclosure pertains only to mortgage loans because it appears in a section of the offering circular entitled "Fund Business and Lending." The Funds' business was, as we noted, originating federally guaranteed real estate loans. Even more compelling, the subsection under that section in which the above statement appears is entitled "Lending Standards and Policies." Of course, it is referring to lending standards for real estate loans. But even more specific than that, the sub-subsection in which the above statement appears is entitled "General Standards for Mortgage Loans." There are several numbered paragraphs under that sub-subsection, one of which is the above disclosure (and one can see the other paragraphs pertain to issues around mortgage loans).

But in any event, as noted above, Mr. Feathers did solicit approval from investors to use the Note Receivable (even though the disclosures make clear he didn't have to) and the investors approved it.

Next the government contends the use of the Note Receivable by the Funds was somehow fraudulent because it was not accounted for according to Generally Accepted Accounting Principles. Even assuming Mr. Feathers knows, or had a legal obligation to know, GAAP, the government will not be able to prove there was fraud. The Funds' accountants decided that the use of the Note Receivable, even though approved by investors, was not proper GAAP accounting. They eventually restated the financial statements for IPF and SPF, noting that they could not assess the collectability of the note. On March 22, 2011, Spiegel issued a qualified audit opinion with the restated financial statements for 2009 and 2010 stating as much.[4] Anyone reading the financial statements would know that the asset (the Note Receivable) is impaired in value because the fund cannot determine the likelihood that it will be paid back (that is because the fund's accountants claimed to have no visibility into the finances of the borrower, fund manager SBCC).

---

[4] Mr. Feathers's expert will testify that a qualified audit opinion is merely a statement of non-conformity with GAAP and not an indicator of fraud.

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

9

First of all, as Mr. Feathers's expert will testify, just because accounting is not in conformity with GAAP does not mean it is fraudulent — particularly when it is clearly disclosed as non-conforming.[5] Second, Mr. Feathers did not fraudulently hide from investors the Note Receivable or the fact that Spiegel believed that Note Receivable was not GAAP-compliant. One might think so from reading only paragraph 24 of the Indictment, which alleges (incorrectly) that Mr. Feathers "failed to disclose" that the Note Receivable was "in reality, unsecured" and that "the Funds were not able to assess the collectability of these receivables." (Indictment ¶ 24(c) & (e).)

The evidence will show that the Note Receivable from SBCC, and its impairment as a result of the collectability issue, was disclosed in the Fund's financial statements. Notes 10, 11, and 14 to IPF's audited financials, for example, refer specifically to the Note Receivable and tell investors that the Fund "does not account for its note receivable" according to GAAP. Note 11 explicitly discloses that "the note is unsecured."

More importantly, the government cannot prove that Mr. Feathers hid the fact that this asset was impaired (that is, that it had to be discounted). Investors were explicitly told that the note's collectability could not be assessed; so it would be risky to place any positive value on the note as an asset. The Fund accountant told investors, in a letter attached to the financials (its so-called qualified opinion), that:

> In our opinion, the carrying value of the note receivable from fund manager may require an allowance for loss which would adequately reflect fair value . . .. The effects on the financial statements of the preceding practice are not reasonably determinable.
>
> In our opinion, except <u>for the effects of not assessing the collectability of the note receivable from fund manager</u>, the consolidated financial statements referred to above present fairly,

---

[5] The government has not claimed, nor could it prove, that the accounting treatment of the Note Receivable violated any of the myriad regulations that governed the Funds' operations. The evidence at trial will show that none of the regulatory agencies who received the Funds' financials disapproved of the Note Receivable's accounting treatment.

in all material respects, the financial position of [IPF]. [emphasis added].

Because of the scrutiny of the accountants, this disclosure in the financials, and Mr. Feathers's efforts to solicit consent from the Fund investors, Mr. Feathers did not believe there was anything improper about the Note Receivable. There will be no evidence at trial that Mr. Feathers tried to hide the financials or the qualified opinion from his investors.

As noted, the testimony at trial will be that the auditors waited several months (until March of 2011) to restate or "correct" the financials. It is likely the accounting firm will testify at trial that it was comfortable waiting so long to "correct" the financials because the change was not material to investors.

Finally, the government contends the amount of money advanced to SBCC under the Note Receivable exceeded what the fund offering documents allowed. But the evidence will show that the advances stayed within the amount that was disclosed. For instance, as to IPF, Spiegel's draft audit of IPF's 2011 books show that the Note Receivable had reached roughly $4.8 million as of January 2012. As Mr. Feathers understood, the fund offering circular as of June 29, 2011 told investors that these advances under the note receivable could be:

> up to 1% of the Fund's maximum capitalization of $500 million or
> up to $5,000,000, which may represent more than 1% of the
> Fund's capital depending on total capitalization at any given time.

Mr. Feathers believed the $4.8 million under the Note Receivable was within the 1% limit of the Fund's maximum capitalization. The Fund's maximum capitalization, as reflected in the above disclosure, was established by a filing made on April 21, 2011 with the California Department of Corporation seeking to increase the maximum capitalization to $500 million. That filing was approved by the Department on, as we noted, the effective date of June 29, 2011. The jury will see these documents. Mr. Feathers did not believe the management company was taking more than it had disclosed it would take (and thus was authorized to take).

How did the indictment get it wrong? Well, it seems to misunderstand the disclosures describing the money flow between the Funds to SBCC. Here's an illustration. Paragraph 18 of the Indictment alleges that Mr. Feathers "represented to investors" that the "monies [they]

deposited with the Funds . . . would not be used to fund the operations of SBCC." But the evidence at trial will show that the June 2010 Offering circular for IPF, for example, says:

> [T]he Manager [i.e., SBCC] may receive up to 1% of the funds maximum offering amount invested **to cover its operating expenses**, marketing, and other overhead items. (p.22)

As the jury will see, the government has a basic misunderstanding of what was "represented to investors."

C. <u>Inter-Fund Transfers of Loans at a Premium</u>

The government alleges that between February 2012 and May 2012, Mr. Feathers secretly caused IPF to purchase nine mortgage loans from SPF at "substantial premiums," and then used those "inflated" premiums to pay management fees to SBCC (and himself). (Indictment ¶ 25.) The government further alleges that Mr. Feathers and SBCC "failed to disclose these inter-company transactions, at inflated prices, designed solely to funnel investor funds" to Mr. Feathers and SBCC. (*Id.*)

In fact, the inter-Fund purchase and sale of mortgage loans at a premium was expressly contemplated by, and disclosed in, the relevant offering documents and operating agreements. For example, the January 28, 2011 Offering Circular for IPF contains the following disclosure regarding the authorization for IPF to purchase loans at a premium:

> <u>Purchase of Loans from Affiliates</u>. *Existing loans funded or acquired by the Manager or its affiliates may be purchased by the Fund.* The Fund may also purchase loans from third parties. All loans purchased by the Fund must satisfy the lending guidelines described above. Generally, the purchase price to the Fund for any such loan will not exceed the par value of the note or its fair market value, whichever is lower, *but the Manager may purchase loans for a premium if the Manager believes the total purchase price is fair and reasonable and in the best interest of the Fund.* [emphasis added]

The June 29, 2011 IPF Offering Circular contains the same disclosure. In addition, the August 2011 SPF operating agreement expressly permitted the sale of the loans to IPF:

> <u>Sale of Loans to Manager or Affiliate</u>. The Company [SPF] may sell existing loans to the Manager or its Affiliates [IPF], but only so

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

12

> long as the Company receives net sale proceeds from such sale in an amount equal to the total unpaid balance of principal, accrued interest and other charges owing under such loan, or the fair market value of such loan, whichever is greater. . . .

The assertion that Mr. Feathers "failed to disclose these inter-company transactions" simply is not true. (Indictment ¶ 25.)

Putting aside the foregoing express disclosures allowing IPF to buy loans at a premium from SPF, the government also alleges that the premiums themselves were fraudulent because Mr. Feathers "inflated" them. The evidence will prove that Mr. Feathers did not artificially create or inflate the premiums. At trial, Mr. Feathers expects to show the premiums on the nine loan sales were between 3% and 7% of the total value of each loan (and within the relevant industry standard). Mr. Feathers will show that he and his employees calculated the amount of the premiums using commonly-accepted practices in the SBA loan industry: the premiums were based on the values of the loans themselves, including the loan balances; the remaining life-spans of the loans; any prepayment penalties (which increase the likely life-span of the loan and therefore the loan's value); and the fact that the loans included SBA guarantees. As just one example of his commitment to employing a sound methodology in calculating the premiums, Mr. Feathers emailed his employees in February 2012: "here is a spreadsheet that I've put together, with some formula drivers, to determine the premiums that will be due from IPF to SBC PF [SPF]. Can you please take this spreadsheet and put together accurate premiums from actual loan balances reflected in your loan accounting software?"

That the loans would fetch premiums in a secondary market should come as no surprise to those who were involved with or followed the SEC's civil enforcement proceedings against Mr. Feathers. As part of his wind-down of the Funds, the court-appointed receiver sold the same types of loans from the Funds two years after the purchases at issue here (when the loans would have had two fewer years of cash flows ahead of them). In those loan sales, the receiver obtained premiums of 10%.

Mr. Feathers will also offer evidence showing he consulted with Spiegel, the Funds' independent CPA auditor, regarding the valuation of the transferred loans. Spiegel advised Mr. Feathers that, in addition to his own method for calculating the premiums, Mr. Feathers should also seek a third-party valuation of the loans and premiums. We believe the evidence will demonstrate that Mr. Feathers did just that. At the very least, the evidence will establish that Mr. Feathers "believe[d] the total purchase price [for the nine loans was] fair and reasonable and in the best interest of the Fund," which is all that was required under IPF's offering documents.

Finally, in addition to the issues of whether the loan purchases by IPF from SPF were authorized and disclosed – they were – and whether Mr. Feathers believed the premiums were reasonable, the evidence will show that SBCC was entitled to the premiums from the loans that it received. That is because Mr. Feathers believed that SBCC was entitled to the money it received because SPF Members had already received their year-to-date "Member Returns" of 7.5%. As the fund disclosures told investors, after the investors were provided their year-to-date return, all fund profits generated above that, including the premiums SPF got from the loan sales, were profits to which SBCC was entitled.[6] The evidence at trial will demonstrate that Mr. Feathers confirmed, at the end of each month from February 2012 to May 2012 when IPF purchased the nine loans from SPF, that the SPF Members had received their maximum monthly returns and the remaining profits rightfully belonged to SBCC. In addition, Mr. Feathers will present expert testimony showing in fact that what his staff was telling him was actually the case. His expert will testify that she analyzed the QuickBooks account of the management company and determined that the SPF investors, through May 2012, did receive the year-to-date distributions (whether in cash or in reinvested dividends) to which they were entitled.

In other words, even if the inter-fund loan transfers were not disclosed, and even if the premiums were, as the government alleges, "designed solely to funnel investor funds" to Mr. Feathers, there would still be no fraud because the investors had already received their maximum

---

[6] The offering documents and operating agreements disclosed that fund profits were first allocated on a monthly basis to the Members *up to* the amount of the Member Return (SPF) and all profits over those amounts went to the Manager, SBCC.

DEFENDANT'S TRIAL MEMORANDUM
Case No. CR 14-0531 LHK

14

returns, as expressly defined in the offering documents, and the remaining money rightfully belonged to SBCC.

### D. Did Mr. Feathers Illegally "Divert" $2 Million

The indictment alleges there is "approximately $2 million" that Mr. Feathers "diverted" from SBCC. There does not seem to be a separate crime alleged here, however. We believe there was no diversion and any evidence the government offers of such diversion should be excluded if it does intend to try to prove a "diversion" case.

It is not entirely clear what the allegation here is. Is the government claiming that Mr. Feathers's own company, SBCC, is the victim? The government does not have any theory how a diversion from SBCC could have harmed the Funds (and, as a result, the investors). If the money that was "diverted" from SBCC belonged to SBCC (for example, was profits earned from the operation of the Funds), then it is simply a matter of Mr. Feathers "diverting" money to Mr. Feathers. If the money did not rightfully belong to SBCC because it was stolen from the Funds, then a transfer of money from SBCC to Mr. Feathers is not a diversion. A person can't steal the same money twice – once from the Funds and once from himself.

In any event, the evidence will show that SBCC had ordinary income of about $2.05 million for January 2009 through June 2012, the period covered by the indictment. If the supposed diversion was from SBCC, the government appears to be contending that every penny it made was "diverted." But the evidence will show that Mr. Feathers and his wife, who had left a high-paying job at a bank to work in this family business, both worked more than full-time. That would be three years' worth of salary for each of them. The government's "diversion" claim would seem to assume they were entitled to no salary.

More importantly, the evidence will show that a large portion of the $2.05 million in ordinary income made by SBCC in that period was paid by third parties for various transactions relating to loan origination and servicing fees, and not by the Funds. The other large part of it (some $900,000) was from premiums on SBA loans sold by SPF to IPF. As we showed above, the evidence will be that SBCC was legitimately entitled to those premiums.

### E. Was There a Secret "Ponzi" Scheme?

The government may assert at trial that Mr. Feathers was secretly running a Ponzi scheme.[7] As this Circuit long ago explained, the "fraud [in a Ponzi scheme] consists" of secretly "transferring proceeds received *from the new investors to previous investors*, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists." *Hayes v. Palm Seedlings Partners-A*, 916 F.2d 528, 531 (9th Cir. 1990) (*emphasis added*).

The evidence will show Mr. Feathers did not conduct a fraudulent Ponzi scheme and had no incentive to do so; the actions the government contends were fraudulently and secretly done were disclosed to investors. Like virtually all legitimate investments, the Funds carried risks and those risks were painstakingly described in the disclosures prepared by the Funds' law firms. As the IPF offering circular, for example, stated, throughout the entire period of the indictment, "[t]he Fund will not set aside any funds to satisfy requests for withdrawals or redemptions from the Fund. A new investor's subscription may be used in whole or in part to fund withdrawals or redemptions." Thus, new investors were explicitly told that their money could be used to pay previous investors who were taking profits (or money) from the Fund as withdrawals or redemptions.

Moreover, one critical component of a Ponzi scheme is that "investors are *promised* large returns for their investments." *Sender v. Nancy Elizabeth R. Heggland Family Trust*, 48 F.3d 470, 471 n.2 (10th 1995) (*emphasis added*). That guaranteed return causes a defendant to scramble to pay investors that guaranteed return (by using new money if there are no profits) so the fraud is not discovered. But that could not have happened here. As we showed above, the Fund disclosures warned that a return – large or otherwise – was <u>not</u> promised. As the offering circular provided, "Fund profits allocated to Members for any calendar year [could be] less than the Member Preferred Return." Mr. Feathers thus had no incentive to hide a lack of profits, or an inability to pay high promised returns by secretly paying existing investors with money from new

---

[7] The SEC made that claim in the district court in the civil case.

investors (and that was his state of mind).

Finally, there were disclosures around distributions to investors. As the offering documents describe, profits were first allocated on a monthly basis to the Members *up to* the amount of the Member Preferred Return of 7.5% per year. As the disclosures provide, the profit is not guaranteed to the Members. In addition, the Manager did not make profits until the Members had been paid their monthly profit allotment (i.e., 7.5% divided by 12). Further, the Fund documents not only warned that no amount of return was guaranteed, but told investors that "[a]ny cash distributed to Members may constitute, wholly or in part, return of capital." In other words, investors were explicitly told that cash they receive in monthly distributions might be their own capital instead of profits, lest they think a particular distribution signaled that the Fund was more profitable than it actually was. And in the offering circular effective June 29, 2011, it is stated that "[t]o the extent cash distributions exceed the current and accumulated earnings and profits of the Fund, they will constitute a return of capital and each Member will be required to reduce the tax basis of his Units."

## IV.   EVIDENTIARY ISSUES

Based on the discovery provided thus far, and what has been disclosed about the government's theories, the defense does not currently anticipate any major evidentiary issues for trial (except for what is noted above as to the so-called "diversion" theory that the government may pursue) or that it will make any *in limine* motions. That assessment may change after the defense receives and reviews the government's trial brief, exhibit list, and witness list.

Dated: December 18, 2017

Respectfully submitted,

EUGENE ILLOVSKY
ILLOVSKY LAW OFFICE

MATTHEW DIRKES

By: _____
EUGENE ILLOVSKY

Attorneys for Defendant
MARK FEATHERS